No. 30,982.

F. M. HORN, *Appellant*, v. HARLAN E. BEAL and THE NATIONAL BANK OF TOPEKA, Executors of the Last Will and Testament of Alonzo Beal, Deceased, *Appellees*.

(22 P. 2d 475.)

Opinion filed June 10, 1933.

*Thomas F. Doran, Clayton E. Kline, Harry W. Colmery, M. F. Cosgrove, J. L. Denefe, J. E. Addington* and *Howard A. Jones,* all of Topeka, for the appellant.

*Tinkham Veale,* of Topeka, for the appellees.

The opinion of the court was delivered by

JOHNSTON, C. J.: This action, as originally brought by F. M. Horn against A. Beal, was one to recover on three cattle transactions between the parties. One count was to recover $7,000, another one to recover $111.50 on a commission for the sale of cattle, and still another to recover $14,500. Interest on the several claims was asked.

While the case was pending in the district court, and before trial, A. Beal died testate, and there was a revivor of the case in the names of Harlan E. Beal and the National Bank of Topeka, executors of the last will of A. Beal. Harlan E. Beal and the National Bank of Topeka thereafter prepared the defense and tried the case, contesting the claims of plaintiff. The defendants prevailed in the action, and plaintiff appeals.

The principal controversy between the parties arises upon the first and third counts of plaintiff's petition, in which he asked a recovery of $7,000 on the first count, and $14,500 upon a third count. On the first, plaintiff alleged, in substance, that in 1925 the plaintiff and A. Beal entered into an oral agreement that the plaintiff should use his time and experience in the purchase of cattle in Texas and that A. Beal would furnish the money to pay for them, the cattle to be pastured and fed by Beal and then marketed, the profits and losses to be equally divided between plaintiff and Beal after deducting any legitimate expenses incurred by either party in handling them.

It was alleged that in 1926, by oral agreement, 300 head of steers were purchased from W. R. Schreiner, of Texas; that plaintiff went to Texas and made the purchase, and that on October 14, 1926, the cattle were received and paid for by a draft on Beal, and then it was arranged to have them wintered by Schreiner; that these cattle were shipped to Beal at Valencia in the spring of 1927; that on or about August 1, 1927, W. H. Shroyer, who was a cattle dealer of the Missouri Live Stock Commission Company, of St. Joseph, Mo., came to the plaintiff's office and represented that he had a buyer interested in the purchase of said steers. Beal and plaintiff con-

sidered the price at which they would sell the cattle and then agreed not to sell them for less than $100 per head. That on August 2, Shroyer came to plaintiff and after further negotiations proposed that the cattle be sold to W. D. Heidrick on a basis of $95 a head for 240 of them, and $90 a head for the remaining sixty. That Shroyer then produced a written contract of sale of the date of August 2, 1927, which was signed by Beal, and W. D. Heidrick, by Shroyer, and which plaintiff signed. Plaintiff alleged that the contract as so signed and delivered to Shroyer was done with the fraudulent intent of deceiving and defrauding plaintiff; that Beal did not sell the cattle to Heidrick as stated for the price mentioned therein, and in truth and in fact no sale was made at that time. The contract of sale, it was alleged, was executed by Beal in conspiracy with Shroyer with the purpose of defrauding plaintiff; that the statements in the contract were false and fraudulent, and were made for the purpose of inducing plaintiff to accept his proportionate share of the profits derived from the claimed sale, and that Beal afterwards purchased the cattle from Shroyer and thus fraudulently obtained ownership of the cattle to be held and sold by him on a higher market; that the cattle were actually sold in the fall of 1927 by Beal, at a price of approximately $40,000, the exact amount being unknown to plaintiff, and that plaintiff was induced to accept as his proportionate share of the profits the sum of $1,960.53, under the sale contract, and that this sum was accepted by him relying on the truth of the representations made by Beal. Plaintiff claimed that his share of the net profits received from the actual sale of the cattle was approximately $7,000 in addition to the amount received by plaintiff for which he made settlement. For this $7,000 he asked judgment against defendants.

The claim of $111.50 under the second count was for one-half of the commission, $223, claimed to have been paid on the sale of the 300 head of steers sold to Shroyer which was charged to him in the settlement and which he alleges he would not have paid except for the fraudulent representations that an actual sale had in fact been made.

In the third count plaintiff alleges that in 1926 he told A. Beal that W. R. Schreiner, of Texas, had 400 three-year-old steers for sale and advised Beal to make arrangements for their purchase. The plaintiff says that he procured an option for their purchase and delivery in the succeeding fall, and he states that it was arranged that

the purchase should be made by both parties on the same terms as to payment and division of profits as in former deals; that later, in October, 1927, when plaintiff inquired of Schreiner when he would be ready to deliver the steers he was told that they had been already sold to Beal for $70 per head, to be pastured and fed by Schreiner until May 1, 1928, and that at the time of the sale to Beal the latter had fraudulently represented to Schreiner that the reason plaintiff did not come down on the purchase was that plaintiff was too busy to get away. He further alleged that the steers purchased by Beal were the same ones upon which he had obtained an option and that they were to be purchased upon the same arrangements as the other deals between him and Beal. He alleged that there had been three former cattle deals between them on the basis mentioned, in one of which there had been a loss which was adjusted in the settlement made, in which the profits had been equally divided between them, and that there was a profit on the purchase of the 400 steers of $29,000, one-half of which he claimed as his share in the transaction.

In their answer defendants deny there was ever any general partnership between Beal and the plaintiff, but they admitted that there were several individual or special agreements in which plaintiff had an interest, but that settlements had been made at the closing of these deals. One of these was the purchase and handling of the 300 steers mentioned in the first count of the petition, and that these steers were purchased and shipped to Valencia to Beal and after being pastured and fed were sold to Shroyer, and that the profits of the transaction were equally divided between them. On January 16, 1928, they alleged, the settlement was made. They specifically deny that there was any misrepresentation or fraud in the sale to Shroyer and allege that Shroyer purchased the 300 head of steers and later sold them to A. Beal and his son, Harlan E. Beal, for a small margin of profit. Shroyer, they alleged, sold the cattle to A. Beal and H. E. Beal, and that the plaintiff had no connection with the purchase, had no interest in those steers then or since that time. They state that they purchased them solely on their own account, and that neither A. Beal nor his son, Harlan E. Beal, ever had made any agreement that plaintiff should have any part in the ownership of the cattle or profits or rights in that purchase. They deny that plaintiff had any interest or connection with the transaction mentioned in the third count of the petition where 400 head of cattle

were purchased by A. Beal and his son, Harlan E. Beal, alleging that they were purchased solely on their own account and that plaintiff had no interest in them.

On the issues joined testimony was produced and the jury made special findings as follows:

"1. Was the written contract for sale of the 300 head of cattle described in plaintiff's first cause of action, which was signed by F. M. Horn, A. Beal and W. D. Heidrick by W. H. Shroyer, on August 2, 1927, a sale in good faith to W. D. Heidrick? A. A sale to W. D. Heidrick, in good faith, if he wanted them; if not, to W. H. Shroyer.

"2. Did F. M. Horn sign the contract mentioned in question 1, believing at the time he signed it that it was a sale in good faith to W. D. Heidrick? A. Yes, either W. D. Heidrick or W. H. Shroyer.

"3. Did W. D. Heidrick give W. H. Shroyer any authority to purchase for him the cattle described in plaintiff's first cause of action? A. No.

"4. Did W. D. Heidrick, prior to the execution of the written contract mentioned above, agree to meet W. H. Shroyer at Valencia or Topeka, at any certain time, for the purpose of going out and examining the cattle mentioned in said written contract, with a view to purchasing the same? A. No certain time.

"5. Did W. D. Heidrick tell W. H. Shroyer that if he did not arrive at a certain time, to inspect the cattle, that Shroyer might purchase them himself? A. No.

"6. Did W. H. Shroyer write out and cause to be signed by A. Beal, at the Jayhawk Hotel, contract of sale mentioned above before he took it to the office of Mr. Horn for his signature? A. No.

"7. Did F. M. Horn agree that W. H. Shroyer should be paid, and did W. H. Shroyer agree to accept, a commission of approximately $223 for making a sale of the cattle in question to W. D. Heidrick? A. Yes.

"8. Did F. M. Horn ever agree to pay W. H. Shroyer a commission of approximately $223 for making a sale of said cattle to himself? A. No.

"9. Was plaintiff's half of the commission charged by Shroyer paid by plaintiff? A. No.

"10. Was the claimed purchase of the cattle mentioned in the contract of August 2, 1927, and the claimed resale thereof to A. Beal, or to Beal and his son, a *bona fide* sale or was it a pretended sale made for the purpose of transferring the title to plaintiff's interest in the cattle to Beal, or to Beal and his son? A. Yes, *bona fide* sale.

"11. Was plaintiff advised, either by A. Beal or Shroyer, on August 2 or August 3, 1927, of any sale of the cattle in question other than the sale to W. D. Heidrick, as evidenced by the written contract? A. The sale to be made either to W. D. Heidrick or W. H. Shroyer.

"12. Was there a sale of the cattle described in plaintiff's first cause of action from Beal and Horn to Shroyer, and if so, when was it made, and what was the consideration paid by Shroyer to Beal and Horn? A. Yes, August 2, 1927. $95 for 240 head and $90 for the cuts.

"13. If you find there was a sale from Beal and Horn to Shroyer, did Shroyer sell the cattle to Beal, or to Beal and son, and if so, on what date was said sale made? A. A. Beal & Son, Harlan E. Beal, on or about August 3, 1927.

"14. If you answer the last question in the affirmative, what was the consideration for the sale from Shroyer to A. Beal or A. Beal and son? A. $95 for 240 head and $90 for the balance plus commission to the Missouri Live Stock Commission Company, St. Joseph, Mo.

"15. Did plaintiff procure an option from W. R. Schreiner for the purchase of the 400 head of cattle described in plaintiff's third cause of action, for himself and A. Beal, in the spring of 1927? A. No.

"16. Was there an agreement between plaintiff and A. Beal by which they were to buy and handle the cattle described in plaintiff's third cause of action as partnership cattle, and if so, when was such agreement made? A. No.

"17. Were the cattle described in plaintiff's third cause of action partnership cattle under any agreement entered into between plaintiff and A. Beal? A. No.

"18. Did A. Beal purchase from W. R. Schreiner, on August 13, 1927, for himself and his son, Harlan Beal, 364 head of three-year-old steers under written contract dated August 13, 1927, and marked defendants' exhibit 5? A. Yes.

"19. Did A. Beal or his son Harlan Beal at any time after August 13, 1927, agree to give plaintiff any interest in the cattle referred to in defendants' exhibit 5? A. No.

"20. Did A. Beal have any cattle deals with plaintiff Horn after January 16, 1928? A. No.

"21. Did Harlan Beal, acting for his father, A. Beal, on January 16, 1928, make a final settlement with plaintiff for all profits and losses on the several partnership deals between the parties, and did Harlan Beal pay plaintiff at that time $638.85 for A. Beal, in full settlement of the profits on the several previous cattle deals? A. Yes.

"22. Did W. H. Shroyer, at the time of the contract, August 2, 1927, marked plaintiff's exhibit 1, give A. Beal, for Horn and Beal, a draft on the Missouri Live Stock Commission Company of St. Joseph, Mo., for $3,000, as a payment on the purchase price of the cattle mentioned in said contract, according to the terms of the same? A. Yes.

"23. Did plaintiff, at the time of accepting said check mentioned in question 21, have full knowledge of the material facts relating to the sale of 300 head of cattle described in plaintiff's exhibit 1? A. Yes.

"24. If you answer the last question in the negative, state what facts plaintiff did not have knowledge of. A. ―――."

The court approved the special findings of the jury, with the exception of one to the effect that plaintiff had not paid the commission on a sale of the cattle, and this finding, in view of the result of the case, is of no material importance. Judgment was then entered for the defendants, except as to the commission charge of $111.50.

No motion for a new trial was made by plaintiff within three days after the findings of the jury came in. A motion was made within three days after the findings were approved and adopted by the court, and an entry of judgment made, and this was several months after the findings of the jury were returned. On this question plaintiff asserts that the jury were only acting in an advisory capacity, that the case was one of equitable cognizance and that in such a case the findings do not become effective until adopted by the court. The trial court stated on the motion for a new trial that the court did not ask or suggest that the advice of the jury be taken, but that the jury was called under an agreement of counsel. It further remarked that he did not regard the case as one of purely equitable cognizance, but that in the counts mentioned sums of money were asked for which A. Beal had wrongfully received. It was not an action for a dissolution of a partnership nor for an accounting in any proper sense of that term. As to the first count there was no question as to the sale contract, but the principal complaint was as to whether a fraud had been committed by A. Beal in obtaining the plaintiff's signature.

Defendants contend that plaintiff is not entitled to a review of the proceedings, as the motion for a new trial was not made within time. Plaintiff contends that the case was one of equitable cognizance, that the jury was only acting in an advisory capacity and that its findings did not become effective until they were approved and adopted by the court and a judgment thereon entered. The court stated, as we have seen, that it did not regard the case as one of equitable cognizance and that it was not one for a dissolution of a partnership or an accounting in any proper sense of that term. The court finally ruled that whether or not the motion for a new trial was made within time, the court, even on plaintiff's theory, would be compelled to render judgment for defendants on the merits of the case.

Without determining the contention of defendants and assuming that the motion for a new trial was filed in due time, we think that the judgment for defendants must be upheld.

On the first count the plaintiff charged conspiracy and fraud against A. Beal, but there was testimony that a *bona fide* sale was made by Horn and Beal of the 300 head of cattle involved in that transaction. A written contract was prepared and signed by Horn and Beal, and W. D. Heidrick by Shroyer, in which the prices were

specified. It was testified that Shroyer, a dealer for the Missouri Live Stock Commission Company, had undertaken to sell the cattle to Heidrick of Hamilton, and had arranged with him to come to Topeka and look at the cattle with a view of purchasing them and had told Heidrick that if he did not come and buy the cattle Shroyer would himself buy them. Shroyer waited for the coming of Heidrick at the appointed time, but he did not come, and that then Shroyer told Horn and Beal that he still expected Heidrick would come, and proceeded to prepare a contract in writing in which Heidrick's name was inserted as the purchaser, but that when Heidrick did not afterward appear Shroyer then agreed to buy the cattle at the agreed price, and when the deal was made he gave a draft as a payment for the cattle, and to this transaction no objection was made by Horn. It turned out that the sale was made to Shroyer and not to Heidrick under the prepared writing, but was orally made to Shroyer for the prices agreed on as specified in the incomplete sale to Heidrick. After effecting the purchase and having learned that Beal had a large quantity of corn for feeding cattle and that Beal and his son were contemplating buying cattle to which to feed the corn, Shroyer proposed a sale of these cattle to them. After some negotiations Beal and son purchased the cattle for a profit to Shroyer of $223.

Plaintiff contended that the sale of the cattle to Shroyer and the resale of the same to Beal and son was done to eliminate and defraud him. Later in the year and after feeding the cattle for a considerable time, Beal and son sold them for a higher price than the price at which they were sold by Horn and Beal to Shroyer. Whether that was an actual sale in good faith or one made to deceive and defraud plaintiff was a question of fact for the jury. On conflicting testimony the jury has found that it was an actual and *bona fide* sale. Beal and son had a right to buy the cattle previously sold to Shroyer, and although Beal and Horn were former owners and had sold the cattle, there was no legal reason why Beal should not join with his son afterwards in buying them and feeding them in the hope of finding a better market. This they could do honestly, and the jury has determined that it was a real and an honest transaction. There was sufficient consideration for the purchase, and the finding of the jury has been approved by the court which heard the evidence on which the finding was based. It is not necessary to

cite authorities that the finding of the jury approved by the court is binding on this court on appeal.

On the third cause of action the jury found that the plaintiff did not procure an option for the purchase of that herd of cattle, and further that there was no agreement by plaintiff with Beal that he should have an interest in those cattle, or that they were to handle them together as partners and, further, that they were purchased and paid for by A. Beal and his son, Harlan, on August 13, 1927; and, also, that there was no subsequent agreement that plaintiff would have any interest in the cattle. While plaintiff testified that he had obtained an option on the cattle and offered some other testimony that he had an understanding with A. Beal that he was to have an interest in them, the jury has found to the contrary on what appears to be sufficient evidence. There was evidence that the sale was made directly to A. Beal and son, who paid for the cattle and pastured and fed them and finally marketed them. On the motion for a new trial, in which the plaintiff insisted that the evidence did not support the findings, the trial court stated that the findings of the jury on this branch of the case were strongly supported by the evidence, and a reading of the record leads us to the same conclusion.

On the second count, involving the $111.50 commission charged to plaintiff, the finding of the jury against the claim of plaintiff was set aside by the trial court. The judgment was in favor of plaintiff on that item, and while defendants complain of the ruling, it has not appealed therefrom and is not entitled to a review of the ruling.

The contention of plaintiff that there was error on the rulings on the admission of evidence and restricting the cross-examination is not sustained, nor was there error in refusing to grant a new trial.

The judgment is affirmed.